ORIGINAL

BUCHALTER
A Professional Corporation
ROBERT S. COOPER (SBN: 158878)
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA 90017-2457
Telephone: (213) 891-0700
Fax: (213) 896-0400
Email: rcooper@buchalter.com

Attorneys for Plaintiff
KAREN KANTER dba KAREN KANTER & ASSOCIATES

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

KAREN KANTER, dba KAREN KANTER & ASSOCIATES,

Plaintiff,

vs.

PLAYBILL, INC., A New York Corporation; PHILIP S. BIRSH, an individual; and DOES 1 through 20, inclusive,

Defendants.

CASE NO. _________

**COMPLAINT FOR DAMAGES**

1. **Breach of Implied-in-Fact Contract**
2. **Promissory Estoppel**
3. **Fraud**
4. **Violation of Cal. Civil Code sect. 1738.13 Et. Seq**

## THE PARTIES, JURISDICTION AND VENUE

1. Plaintiff KAREN KANTER, DBA KAREN KANTER & ASSOCIATES, ("KANTER" or "Plaintiff") is an individual operating as a C-Corporation which is and was at all pertinent times authorized to do business and doing business in Los Angeles County California and residing in Los Angeles County California.

2. Defendant PLAYBILL, INC. ("PLAYBILL") is a New York corporation founded in 1884 with its principal place of business located at 525 7th Avenue, Suite 1801, New York, NY 10018. PLAYBILL publishes and distributes a monthly magazine for theatre-goers. The magazine is used at nearly every

Broadway theatre, as well as many Off-Broadway productions. Outside of New York City, PLAYBILL is used at theatres throughout the United States, including in Los Angeles, San Diego and San Francisco California. PLAYBILL was at all pertinent times and is authorized to do business and doing business in the State of California, in the County of Los Angeles.

3. Defendant PHILIP BIRSH ("BIRSH") is the President and Publisher of Playbill, Inc. and on information and belief is a resident of New York City, NY.

4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. sect. 1332 based upon diversity of citizenship and the amount in controversy exceeds $75,000.

5. Venue is proper in this district pursuant to 28 U.S.C. sect. 1391 (b).

**GENERAL ALLEGATIONS**

6. PLAYBILL publishes and distributes a monthly U.S magazine for theatregoers. Although there is a subscription edition available for home delivery, most copies of *Playbill* are printed for particular productions and distributed free of charge at the door as the show's program. The monthly circulation of *Playbill* is approximately four million. PLAYBILL generates revenue through, among other avenues, selling advertising space in the magazine to major manufacturers, retailers and service providers who wish to enhance sales of their products and services by having their advertising distributed to *Playbill's* well-heeled audience of consumers who are theatregoers.

7. The demographics of the average Broadway audience are that the annual average household income is $201,500, and more than one-third of this audience earns more than $150,000 per year and have a post-graduate college degree. Advertisers in *Playbill* include major product manufacturers, major brand retailers and service providers, including manufacturing companies such as automakers Lexus, BMW, Cadillac, Mercedes- Benz, Porsche and Toyota, cosmetics brands such as Este Lauder, Chanel Beaute, entertainment companies

including Disney Entertainment, HBO Network, NBC, Netflix and PBS, fashion and luxury goods manufacturers such as Abercrombie & Fitch, Cartier, Rolex and Louis Vuitton, financial entities including Chubb, Ernst & Young, Geico, Mastercard and Travelers Insurance, the Metropolitan Museum of Art and MoMA, retail stores including Bloomingdales, Macy's and Saks Fifth Avenue, travel industry entities and numerous other companies including restaurants, Carnegie Hall and Steinway & Sons piano makers. PLAYBILL routinely generates millions of dollars per year from selling advertising space in its magazine and distributing the magazine to consumers on behalf of its manufacturing and retail customers.

8. On or about January 17, 2003, KANTER and PLAYBILL entered into a written sales representative agreement. The written agreement called for KANTER to be an exclusive, independent sales representative for PLAYBILL with a territory of the West Coast, for the purpose of selling advertising space for the magazine. The written agreement called for PLAYBILL to pay KANTER an advance on commissions as well as commissions on net advertising revenue per PLAYBILL 's accepted advertising contracts entered into with companies who purchased advertising space in the magazine. KANTER was at all times an independent contractor under the terms of the agreement. KANTER's commission rate varied from 9%-12% depending upon net revenue thresholds reached.

9. The written agreement between KANTER and PLAYBILL further stated that the "Sales representative shall continue to receive the commissions as provided on executed and accepted advertising contracts sold by the Representative that are in force prior to the expiration of the Sales Representative Agreement. " The written sales representative agreement set forth a two-year term, from 1/17/03 to 1/31/05. The agreement was signed by Plaintiff Karen Kanter for Karen Kanter & Associates and Defendant Philip Birsh for PLAYBILL in late January 2003.

10. Two years later on January 10, 2005, as the term of the written agreement was getting close to expiration, KANTER sent a memo to BIRSH

requesting that PLAYBILL provide a written understanding of their relationship going forward. BIRSH did not respond to this request initially. However, after KANTER persisted, they discussed the matter further at a meeting in New York on March 23, 2005. At that meeting, BIRSH handed KANTER two pieces of paper. The first was a two-page document entitled, "NATIONAL SALES REPRESENTATIVES TERRITORY & COMPENSATION POLICIES" ("Sales Policies"), setting forth PLAYBILL'S general policies with respect to independent contractor sales representatives such as Plaintiff KANTER. The second document, entitled "NATIONAL SALES REPRESENTATIVES TERRITORY AND COMPENSATION DETAIL," ("Sales Compensation") was a one-page statement setting forth Plaintiff KANTER 's compensation, commission percentage and territory.

11. Neither of these two documents purported to be an actual contract and neither had signature lines, nor was either document signed by either party. In fact, the Sales Policies document expressly stated that neither document was a contract. Instead it indicated that as a matter of PLAYBILL'S company policy, "[w]e do not have contract renewals with a Representative… In some instances a one-year first agreement has been drafted and signed. However since after this initial working period the relationship can be terminated at any time by either PLAYBILL or the Representative, PLAYBILL does not renew such agreements."

12. After KANTER was handed these two documents, the parties exchanged several emails with respect the draw and commission rate for Hawaii and other matters. Eventually, the two documents were amended and re-sent to KANTER in an email from Senior Vice President of PLAYBILL Clifford Tinder. Tinder's email dated April 25, 2005 to Plaintiff Karen Kanter stated, "Here is the *letter* as Phil [Birsh] has approved it," again not referring to the two documents as a contract. Later that same evening Tinder sent via email the final version of the two documents to KANTER, making one further revision to include Hawaii territory at

a 15% commission rate, stating "attached is the revised *letter* that includes Hawaii at 15%."

13. The Sales Policies document also stated in pertinent part, the following:

"All Representatives are independent agents and have no authority to commit PLAYBILL Incorporated to anything of any nature or kind at any time. Representatives are responsible for all their own expenses of any kind and nature…Commissions are never due on anything other than signed and accepted contracts for either new or renewing advertisers…Commissions are calculated as a percentage of monies net of all agency commissions actually received from advertising clients….PLAYBILL'S current policy is to pay commissions due Representative on or about the fifteenth of the month following the month in which we receive payment from your clients…As a matter of courtesy, not legal requirement, PLAYBILL will give Representative 30 days written notice in the event of termination. In that event, and regardless of who terminates the arrangement, the Representative will be entitled to commission on any written, signed contract that has been submitted to and accepted by PLAYBILL and for the full term of such written, signed and accepted contracts, if any. The Sales Policies document also stated : "No Representative need fear that changes in territory, compensation levels or payment procedures will effect sales made prior to such changes…" [Emphasis added]

14. The second document provided to KANTER at the New York meeting with BIRSH was the Sales Compensation document, which stated in pertinent part as follows:

"Consistent with the policies of PLAYBILL Incorporated applicable to National Sales Representation add attached hereto, what follows are the specific details of compensation, territory and account assignments for:

Karen Kanter." The Sales Compensation document further set forth KANTER's commission percentage of 10% (11% for sales exceeding $4,000,000), her territory consisting of "the states of California, Oregon, Washington and the city of Las Vegas" and that KANTER's accounts were to be "national in character, corporations selling goods and services throughout the country."

15. The Sales Compensation and Sales Policies documents were essentially consistent with the written sales representative agreement under which KANTER and PLAYBILL had operated under from 2003-2005.

16. For the next 11 years, from 2005 through March 2016, KANTER continued to successfully sell advertising space to major manufacturing companies for PLAYBILL for the West Coast territory, and was paid commissions in accord with the policies and terms set forth in PLAYBILL'S Sales Policies and Sales Compensation documents. KANTER routinely sold millions of dollars per year of advertising space in *Playbill* to companies in the West Coast territory, including to such large national manufacturing companies as Lexus, Toyota, Walt Disney, Paramount Pictures, L.A. Philharmonic and Steinway & Sons Pianos, all of which were desirous of having PLAYBILL distribute their company's advertisements to PLAYBILL's consumer market of some four million theatregoers.

17. On February 9, 2016, KANTER wrote to BIRSH, giving written notice per the Sales Policies that she was terminating the Sales Representative Agreement with PLAYBILL, effective March 15, 2016, to pursue new career opportunities. KANTER submitted with her termination letter a list of all signed contracts and insertion orders covering KANTER's advertising sales for the period April 2016 through March 2018.

18. KANTER's advertising sales that were in place prior to terminating the Agreement included in some cases multi-year contracts with Lexus, Toyota Prius, Steinway & Sons, City National Bank, L.A. Philharmonic, Walt Disney

Moana and others. As per PLAYBILL'S written Sales Policies, all of KANTER'S sales prior to terminating the Agreement were reflected by written and signed contracts with manufacturing companies that had been submitted to and accepted by PLAYBILL.

19. Approximately 6 weeks after KANTER terminated the Sales Representative Agreement with PLAYBILL, PLAYBILL demanded that KANTER provide PLAYBILL with a list of film studio contacts. Because KANTER was at all times an independent contractor, KANTER was reluctant to provide the film studio contacts, which KANTER had amassed over many years. Although KANTER subsequently agreed to provide her entertainment industry contacts to PLAYBILL, BIRSH was angry with her for failing to do so immediately. BIRSH called Karen Kanter and indicated that he was angry with her for not immediately providing her entertainment contacts, and informed Ms. Kanter that "You do not have a contract, you never signed one, and I am going to cut you off."

20. On June 10, 2016, in response to an email from KANTER'S prior legal counsel Barry Kellman, in which Kellman reiterated KANTER'S willingness to provide her entertainment contact list TO PLAYBILL, BIRSH sent an angry response email to Kellman, again implying that KANTER had no right to receive any further commission payments since there was no "in force" agreement with PLAYBILL. BIRSH's email stated: "I cannot agree with any aspect of your characterization of any part of this letter. The logic is also unfinished at best. I wil not believe there to be a clarifying moment of insight once she learned that a request came from me versus my publisher. It is at best disingenuous and by its simplicity insulting. Perhaps it would be best to refer to any in force agreement to settle this issue. Until then please inform your client that as of now we are not seeking this information from her and are supremely disappointed in how this has unfolded. Karen is welcome to call me and discuss this situation."

21. Despite KANTER making demands to PLAYBILL for payment of tl

commissions due to her since March 2016, PLAYBILL has steadfastly refused to pay KANTER any of her due commissions.

22. Based upon signed and accepted contracts to purchase advertising space in *Playbill* sold by KANTER, PLAYBILL owes KANTER $301,848.00 in commissions.

**COUNT 1**

**BREACH OF IMPLIED-IN-FACT CONTRACT**

(As Against Playbill and DOES 1 THROUGH 10)

23. Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 1 through 22, inclusive, as though fully set forth herein.

24. From 2003 through 2005, Plaintiff KANTER and Defendant PLAYBILL had an express, written sales representative agreement under which KANTER sold advertising space for PLAYBILL, at a stated draw of $8,333.33, with a stated territory of California, Oregon, Washington and the city of Las Vegas, at stated commission rates for sales ranging from 9%-12% depending upon yearly net revenue thresholds.

25. In 2005, after Plaintiff's written contract had expired, PLAYBILL and BIRSH indicated that PLAYBILL would not renew the agreement or enter into any subsequent written sales agreements with KANTER, however defendant set forth in unsigned written documents both PLAYBILL's policies (Sales Policies document) and KANTER's compensation (Sales Compensation document), which documents and terms would govern KANTER's sales of advertising space for PLAYBILL going forward. The terms set forth in these documents were virtually identical in territory, commission rate and sales policies and procedures as those contained in the prior express written sales representative agreement between the parties.

26. During the next 11 years, from 2005-2016, KANTER performed as a exclusive independent sales representative in the West Coast territory, selling advertising space for PLAYBILL in accord with the terms, conditions and policies

set forth in the Sales Policies and Sales Compensation documents. During this 11-year period, KANTER received commission payments from PLAYBILL on a monthly basis, in accord with these terms and conditions. Additionally during 2005-2016, the parties had extensive written and verbal communications which reinforced the existence of their sales commission agreement.

27. This extensive course of conduct between the parties manifested the existence of an implied-in-fact agreement ("Agreement") between KANTER and PLAYBILL under the terms set forth in the Sales Policies and Sales Compensation documents, which in turn were essentially identical to the terms under which the parties had operated under the express written sales agreement from 2003-2005.

28. Plaintiff has performed all duties required under the Agreement with PLAYBILL.

29. PLAYBILL breached the Agreement with Plaintiff by refusing to pay commissions due under the agreement and in bad faith denying the existence of the Agreement between PLAYBILL and KANTER.

30. As a proximate result of PLAYBILL's breach of the Agreement, Plaintiff has suffered damages in the amount of $301,848, plus interest and consequential damages in an amount to be stated at the time of trial.

**COUNT 2**

**PROMISSORY ESTOPPEL**

(As Against Playbill and DOES 1 THROUGH 10)

31. Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 1 through 22, and 24 through 30, inclusive, as though fully set forth herein.

32. Defendants by their conduct and extensive written and oral representations to Plaintiff, as set forth herein, to the effect that the parties were at all relevant times acting under a sales agreement for sale of advertising space, intended to mislead Plaintiff.

33. Plaintiff reasonably relied upon Defendants conduct, promises and representations and in reliance thereon, suffered substantial detriment by expending her time and resources performing under the Agreement, when BIRSH and PLAYBILL did not intend to perform by paying Plaintiff's earned commissions under the Agreement.

34. As a proximate result of Defendant's breach of the agreement, Plaintiff has suffered damages in the amount of $301,484, plus interest and consequential damages.

## COUNT 3

## FRAUD

(As Against Playbill , Philip Birsh and DOES 1 THROUGH 20)

35. Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 1 through 22, 24 through 30, and 32 through 34, inclusive, as though fully set forth herein.

36. Defendant BIRSH represented to Plaintiff that she was operating under a verbal and implied contract manifested by the Sales Policies and Sales Compensation documents that were provided to Plaintiff by PLAYBILL and negotiated between the parties. BIRSH intentionally did not renew Plaintiff's express written sales agreement so that he could subsequently deny that any contract existed between the parties and have leverage over KANTER in his mind should there be any disagreement between the parties. BIRSH provided the unsigned Sales Policies and Sales Compensation documents to Plaintiff, rather than entering into an express, written agreement signed by the parties, as a promise made without any intent to fully perform, and as a means to induce Plaintiff to continue performing under the agreement while BIRSH believed he was reserving the right to deny that any contract existed between the parties at any time he chose.

37. Plaintiff justifiably relied on the representations of BIRSH and PLAYBILL and relied upon the terms and conditions set forth in the Sales Policies

and Sales Compensation documents provided by Defendants and continued to perform under the terms and conditions set forth in the Sales Policies and Sales Compensation documents for more than a decade.

38. As a result of Defendants misrepresentations and promises made without the intent to fully perform, Plaintiff has sustained damages including unpaid commissions in the amount of $301,848 plus interest and other special damages.

39. Defendants PLAYBILL and BIRSH, and each of them, in doing the things herein alleged, acted despicably, willfully, maliciously, oppressively, and with full knowledge of the adverse effect of their actions on Plaintiff, and with willful and deliberate disregard to the consequences to Plaintiff. As a direct result of the fraudulent, willful, and malicious conduct of these Defendants, and each of them, Plaintiff is entitled to exemplary and punitive damages against these defendants in an amount to be determined at trial.

**COUNT 4**

**VIOLATION OF *CALIFORNIA CIVIL CODE* Sect. 1738.10, ET. SEQ.**

(As Against Playbill and DOES 1 THROUGH 20)

40. Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 1 through 22, 24 through 30, 32 through 34, and 36 through 39 inclusive, as though fully set forth herein.

41. PLAYBILL and DOES 1 through 10 are engaged in the business of creating, publishing and distributing *Playbill* magazine. PLAYBILL generates significant revenue by selling advertising space in its magazine to major product manufacturers, major brand retail and services companies worldwide, including California-based companies, and then distributing the magazine and the advertising of its customers to consumers, who are comprised of approximately four million

theatregoers located in the United States, including in California, so that these consumers have access to their customer's advertising of their goods and services, which in turn would help generate sales of their customers' products.

42. In selling its advertising space to manufacturing and service companies, and then distributing its customers' advertising to consumers, including consumers in California, PLAYBILL was acting as a "manufacturer" pursuant to *California Civil Code* section 1738.12(a) and/or a "distributor" pursuant to section 1738.12(c).

43. In selling advertising space to manufacturers for distribution of the advertising to consumers, including consumers in California, KANTER was acting as a "wholesale sales representative" pursuant to *California Civil Code* section 1738.12(e), in that she was paid in whole or part by commission, but did not place orders for her own account for resale or sell or take orders for the direct sale of products to the ultimate consumer.

44. Defendant PLAYBILL willfully failed to enter into a written contract with Plaintiff as required and/or willfully failed to pay commissions as provided in the Agreement, and is therefore liable to Plaintiff for treble damages.

45. As a result of Defendant's violation of *Civil Code* sect. 1738.10, *et. seq.*, Plaintiff has sustained damages including unpaid commissions in the amount of $301,848, plus treble damages, interest and other special damages, and costs and attorney fees, in an amount to be proven at the time of trial

**WHEREFORE**, Plaintiff demands judgment against Defendants for economic damages for unpaid commissions in the amount of $301,848, treble damages and attorney fees pursuant to *California Civil Code* section 1738.10 et seq., consequential damages sustained according to proof, plus interest and costs, and any other relief the Court may deem proper and equitable.

**JURY DEMAND**

Plaintiff demands a trial by jury on all counts so triable.

DATED: May 19, 2017

BUCHALTER
A Professional Corporation

By: ______________________
ROBERT S. COOPER
Attorneys for Plaintiff KAREN KANTER
dba KAREN KANTER & ASSOCIATES